Schawanda HOLSTON, Plaintiff,

v.

THE SPORTS AUTHORITY,
INC., Defendant.

No. CIV.A.1:98CV3678JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 29, 2000.

1320

Laura Clair Horlock, Pankey Coffman & Horlock, Larry Allen Pankey, Pankey Coffman & Horlock, Decatur, GA, for Plaintiff.

David L. Gordon, Jackson Lewis Schnitzler & Krupman, Christopher Todd Van Dyke, Jackson Lewis Schnitzler & Krupman, Atlanta, GA, for Defendant.

## *ORDER*

CARNES, District Judge.

The above-captioned employment discrimination action is before the Court on defendant's Objections [22] to the Magistrate Judge's Report and Recommendation [21], which recommended granting in part and denying in part defendant's Motion for Summary Judgment [12]. The Magistrate Judge recommended that defendant's motion be granted as to plaintiff's state law claims of intentional infliction of emotional distress and negligent retention, but recommended that it be denied as to plaintiff's claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and race discrimination under 42 U.S.C. § 1981 ("Section 1981"). The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that defendant's Objections [22] should be **SUSTAINED.**

The Court **ADOPTS** the Magistrate Judge's recommendation as to plaintiff's state law claims. The Court **REJECTS** the Magistrate Judge's recommendation, however, as to plaintiff's claims of race discrimination under Title VII and Section 1981 and retaliation under Title VII. Upon review of the record, the Court concludes that defendant's motion for summary judgment should be granted as to these claims as well. Thus, the Magistrate Judge's Report and Recommendation [21] is **ADOPTED IN PART and REJECTED IN PART** and defendant's Motion For Summary Judgment [12] is hereby **GRANTED** in its entirety.

## *FACTS*

Neither party has objected to the Magistrate Judge's findings of fact, and the Court finds them to be accurate. Therefore, the Court adopts the findings of fact as set out in the Magistrate Judge's Report and Recommendation. In sum, plaintiff, an African–American woman, alleges that she was discharged from her employment with defendant The Sports Authority, Inc. ("TSA") on July 1, 1998, because of her race and because she had previously filed an internal complaint of race discrimination. Defendant contends that it terminated plaintiff's employment because she abruptly left the workplace in the middle of her shift without permission and without adequately informing her supervisor. Plaintiff argues that she has presented evidence that defendant has treated similarly situated non-minority employees more favorably than it treated her, and that defendant's proffered reason for firing her is a mere pretext for unlawful race discrimination and retaliation.

Although the Court has adopted the findings of fact set out in the Report and Recommendation, a brief summary of the relevant facts is as follows: plaintiff, a black female, was employed by TSA as an outbound shipping associate ("OSA") from October, 1997, through July 1, 1998.

Plaintiff's duties as an OSA involved packing products such as sporting goods and apparel into boxes for shipping to TSA's retail stores, and during her shift, she was stationed along a conveyor belt transporting the plastic bins filled with products that were to be packed into the appropriate boxes. Her immediate supervisor was Gayle Wolfson, a white woman, who reported to Rodney Littlejohn, a black man, who at all relevant times was the shipping manager for TSA at the Regional Distribution Center where plaintiff worked. In mid-May, 1998, plaintiff submitted a written complaint to defendant regarding Wolfson's failure to promote plaintiff to a "lead" position; plaintiff alleges that she wrote in that complaint that Wolfson favored white employees over black employees[1]. Plaintiff's complaint was forwarded to Littlejohn, and he met with plaintiff to discuss her allegations. He told her that he would look into the matter. Littlejohn contends that, although plaintiff did complain about not being promoted to a lead position, she did not contend that she felt Wolfson was discriminating against her because of her race.

On June 30, 1998, plaintiff began her shift as usual at 7:30 a.m., but by mid-morning, she began to suffer from intense vaginal itching related to a recurrent yeast infection. Plaintiff wanted to leave work to see her doctor, and contends that she searched for Wolfson, but could not find her. Accordingly, she left a note for Wolfson on her desk that stated: "Gayle, I'm too hot! Had to leave. Schawanda." Plaintiff did not include more specific details about her medical condition because Wolfson's desk was in an open area and plaintiff wanted to keep her condition private. Plaintiff alleges that on her way out of the building, she saw Tracee Hines, a black woman who was another supervisor, explained to Hines that she needed to see her doctor, and told Hines that she could not find Wolfson, but had left her a note telling her that she had to leave early. According to plaintiff, Hines responded that she would tell Wolfson that plaintiff had to leave early. Plaintiff then clocked out at around 11:00 a.m. (Tracee Hines, who was not deposed by plaintiff, has submitted an affidavit that indicates that plaintiff neither revealed any reason why she was leaving early nor requested Hines's permission to leave. (Hines Aff., Def's Motion For Summary Judgment [12], Ex. 4), ¶¶ 4–5).[2]

---

1. Neither party has presented a copy of plaintiff's original complaint, and it is disputed whether plaintiff specifically alleged that Wolfson was discriminating against plaintiff because of her race. *See* Report and Recommendation at 4–5.

2. Hines's affidavit is not altogether clear about exactly what occurred between plaintiff and her on the morning of June 30, 1998. While, as noted *supra*, Hines avers that plaintiff neither revealed any reason why she was leaving early nor requested Hines's permission to leave, Hines does not indicate whether she saw plaintiff leave or whether she had a discussion with plaintiff about the latter's leaving early. That omission suggests that Hines might have had some awareness that plaintiff was leaving early and leaves open the possibility that she likewise may have had

some conversation with plaintiff about the latter's departure.

This inference is confirmed by Gayle Wolfson, who testified in her deposition that shortly after plaintiff's termination, Hines had told Wolfson that she had in fact seen plaintiff clocking out that morning and that they had had a brief conversation before plaintiff left work. *See* Wolfson Dep. at 28, 103. According to Wolfson, Hines did not indicate whether plaintiff had mentioned that she was experiencing a medical problem. *Id.* at 103. As to the question whether plaintiff had asked Hines to inform Wolfson of plaintiff's absence, Wolfson initially testified that Hines had indicated that, upon seeing plaintiff leave, Hines asked whether plaintiff had informed Wolfson. Specifically, "Tracy [Hines] said [to plaintiff], '[D]id you ask Gayle,' and that she

When Wolfson found plaintiff's note, she brought it immediately to Littlejohn's office, and found Littlejohn talking on the telephone. Wolfson wrote on the back of plaintiff's note: "She clocked out at 11:00 a.m." and left the note with Littlejohn. She and Littlejohn did not discuss the matter further at that time, but Littlejohn subsequently interviewed all the lead persons and supervisors in plaintiff's work area to determine whether plaintiff had notified any of them that she was leaving work early. It is undisputed that every lead person and supervisor, including Hines,[3] to whom Littlejohn spoke told him that plaintiff had not notified them that she was leaving work early.

Based on his investigation into the matter, Littlejohn concluded that plaintiff had abandoned her job without authorization and he notified the operations manager. Together, they called the company's Human Resources department to discuss the situation. Littlejohn then decided to terminate plaintiff's employment. The following day, July 1, 1998, plaintiff reported to work at her regular time, and Wolfson escorted her to Littlejohn's office, where Littlejohn informed her that her employment was being terminated for job abandonment. Plaintiff contends that she in-

formed Littlejohn at that time that she had received permission from Hines to leave early, but Littlejohn denies that plaintiff so informed him.[4]

Plaintiff claims that her discharge was the result of discrimination against her because of her race and retaliation against her because of her internal complaint about Wolfson's failure to promote her to a lead position.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505.

Summary judgment is not properly viewed as a device that the trial court may,

said 'yes,' or 'tell Gayle.'" *Id.* at 27–28. Looking only at this last statement, Wolfson expresses uncertainty whether Hines indicated that plaintiff had asked Hines to inform Wolfson of plaintiff's departure or whether Hines indicated that plaintiff had said that she had already informed Wolfson. On immediate follow-up to this response, Wolfson testified that "Tracy had said that she saw Schawanda clock out and said, '[D]id you talk to Gayle and tell her you're leaving,' and Schawanda said, '[Y]es.' And that was it. That's all Tracy had said, that, you know, she had seen her clock out and said she had seen me." *Id.* at 28. Wolfson then goes on to testify that she had not given plaintiff permission and that, if plaintiff so indicated, plaintiff was not being truthful. *Id.* 28–29.

3. In his deposition, Littlejohn testified that Hines had told him that she did not speak to plaintiff that morning about plaintiff's leaving work early and that plaintiff did not notify Hines that she was leaving work early. Littlejohn Dep. at 16–17. In her affidavit, Hines avers only that plaintiff never notified Hines that she was leaving early and Hines never gave plaintiff permission to leave early. Hines Aff., at ¶ 6.

4. Littlejohn states that in response to his question why plaintiff had not notified a supervisor, plaintiff answered that she felt leaving a note was enough. Littlejohn Dep. at 34–35.

in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548. However, the movant is not required to negate every element of his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

## II. *Plaintiff's Race Discrimination Claim*

Plaintiff has asserted a claim under both Title VII and Section 1981 for race discrimination. She contends that she was discharged from her employment by TSA on July 1, 1998, because of her race.

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Section 1981 prohibits racial discrimination in the making and enforcing of contracts.[5] The statute states:

> All persons within the jurisdiction of the United States shall have the same rights in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

42 U.S.C. § 1981.

■ To prevail on a claim of race discrimination under either Title VII or Section 1981,[6] a plaintiff must prove that the

---

**5.** Defendant objects to the Magistrate Judge's finding that 42 U.S.C. § 1981 applies to at-will employees in Georgia. *See* Def.'s Objection at 21–22; Report and Recommendation at 11 n. 6. This issue has not been settled by the Eleventh Circuit. Because the Court has concluded herein that plaintiff's claim of race discrimination under Title VII or Section 1981 can not survive summary judgment, it

will assume, without deciding, that Section 1981 does apply to at-will employees in Georgia.

**6.** In *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998), a panel of the Eleventh Circuit stated that "[b]oth of these statutes have the same requirements of proof and use the same analytical framework,

defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–981 (11th Cir.1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir.1983); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 175, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (Section 1981). Such discriminatory intent may be established by one of three generally accepted methods: by direct evidence of discriminatory intent; by circumstantial evidence meeting the test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); or through statistical proof. *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir.1989); *see also Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir.1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984).

Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *Holifield*, 115 F.3d at 1561–62. Under the *McDonnell Douglas* framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of racial discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310, *modified on other grounds*, 151 F.3d 1321 (11th Cir.1998).

Once a plaintiff presents evidence sufficient to permit an inference of discrimination, and thus establishes a *prima facie*

case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action, and produce some evidence in support of that reason. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Jones*, 137 F.3d at 1310; *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–4, 67 L.Ed.2d 207 (1981). If the defendant is able to meet this burden of production, the plaintiff, in order to prevail, must then present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–4.

This *McDonnell Douglas–Burdine* framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix*, 738 F.2d at 1184. The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Nix*, 738 F.2d at 1184 (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–14, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983)); *Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

### A. *Prima facie* case

As the Magistrate Judge noted, plaintiff does not contend that she has direct evidence of any discriminatory intent on behalf of defendant; thus, her claim of discriminatory treatment rests purely on

therefore [it is appropriate to] explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." Thus, the analysis of plain-

tiff's claim of race discrimination under Title VII applies equally to her claim under Section 1981.

**1326**

circumstantial evidence and must be analyzed under the *McDonnell Douglas–Burdine* framework. Under this framework, plaintiff must first establish a *prima facie* case of discrimination under Title VII by showing that: 1) she is a member of a protected class; 2) she was subjected to an adverse job action; 3) her employer treated other similarly situated employees outside her protected class more favorably; and 4) she was qualified to do the job. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

### 1. Standard for Determining Relevant Comparators

■ In order to state a claim for discriminatory discharge under Title VII, plaintiff can not merely allege that she is black and that she was fired. She must show that her employer did not fire other similarly situated non-minority employees who committed the same infraction that she allegedly committed, thereby giving rise to a presumption that her termination was based on her race.[7] Indeed, the Eleventh Circuit requires that a plaintiff show a very high level of similarity of misconduct by a relevant comparator in order to meet the burden of presenting a *prima facie* case. *See, e.g., Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999) ("We require that the quantity and quality of the comparator's misconduct be *nearly identical* to prevent courts from second-guessing employers' reasonable business decisions

and confusing apples with oranges.") (emphasis added); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184–1185 (11th Cir.1984) (a plaintiff alleging discriminatory discharge must show that the misconduct for which he was fired was "nearly identical" to conduct engaged in by a employee outside the protected class, who was retained by the employer); *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir.1982) (plaintiff must establish that the misconduct for which she was fired was "nearly identical" to that committed by a person outside her protected class who was retained).

■ Moreover, an examination of the rigorous scrutiny that the Eleventh Circuit has given to claims of discriminatory discipline reveals that the Eleventh Circuit indeed implements this standard of requiring a plaintiff to show nearly identical conduct by a purported comparator to establish a *prima facie* case. *See, e.g., Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310 (11th Cir.1998) (plaintiff discharged for alleged tardiness and insubordination failed to show "nearly identical" conduct by presenting evidence that purported comparators also were tardy or insubordinate, because both aspects of plaintiff's alleged misconduct occurred on same day);[8] *Davin*, 678 F.2d at 570, 571 (plaintiff discharged for, *inter alia*, threatening to have a coemployee fired for reporting misconduct by plaintiff did not present evidence of "nearly identical" conduct by a purported comparator who told other em-

---

**7.** There are other methods available for establishing a *prima facie* case of discriminatory discharge; for example, under certain circumstances, a plaintiff could show that she was replaced by someone outside her protected class. *See, e.g., Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). In the instant action, however, it is undisputed that plaintiff was not replaced. *See* Def.'s Statement of Material Facts

("SMF") at ¶ 79; Pl. Resp. to SMF at ¶ 79. Plaintiff argues that she can also present a *prima facie* case of discriminatory discharge by showing that she did not violate the work rule that she was accused of violating. As discussed *infra*, this is not the law in the Eleventh Circuit.

**8.** *See* discussion, *infra*.

ployees conducting an investigation into his alleged wrongdoing that he would "settle up with them").

Plaintiff and the Magistrate Judge, however, posit that, with the issuance of a new Eleventh Circuit case, *Alexander v. Fulton County*, 207 F.3d 1303, 1334, *reh'g and reh'g en banc denied*, 218 F.3d 749 (11th Cir.2000), the "nearly identical" standard is no longer the rule in the Eleventh Circuit. *See* Report and Recommendation [21] at 16–17. This Court, however, agrees with defendant that *Alexander* does not change the long-standing requirement that the alleged conduct of a similarly situated comparator must be nearly identical in order for plaintiff to establish a *prima facie* case of discriminatory discipline. First, even assuming that *Alexander* intended to change this standard, as a later-issued case, it could not change earlier precedent issued by the circuit. *See Walker v. Mortham*, 158 F.3d 1177, 1188–89 (11th Cir.1998) (when a panel decision contradicts an earlier panel decision, the earlier decision controls).

Second, it is not clear that *Alexander* intended the sweeping change in the law that plaintiff ascribes to it. That is, in discussing the standard that governs the requisite similarity between the misconduct of a Title VII plaintiff and a purported comparator, the *Alexander* panel did not even cite the pivotal cases in this area: *Maniccia, Nix, Bessemer,* and *Davin.* Rather, the panel cited only two cases— *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1265 (11th Cir. 1996), and *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989)—neither of which addressed the requisite level of similarity necessary to make out a *prima facie* case of discriminatory discipline. In *Osram*, a case that has never been cited by any other Eleventh Circuit panel, the panel did state that "[d]isparate treatment

exists when similarly situated workers are treated differently even though they have committed similar acts." Notwithstanding this general observation, the panel was not faced with the question of the necessary level of similarity, but instead dealt with the question whether a plaintiff could look at the post-discharge conduct of an employer in making her *prima facie* case. *Osram*, 87 F.3d at 1265 (quoted in *Alexander*, 207 F.3d at 1334). Likewise, although reciting a standard on the question of similar misconduct, the panel in *Jones* was not called on to decide whether the conduct in its case was similar enough. Instead, its decision focused on whether a plaintiff could establish a *prima facie* case based on a former supervisor's acquiescence in a particular rule violation, when a new supervisor was now in charge and had announced that such rule violations would no longer be tolerated. *Jones v. Gerwens*, 874 F.2d at 1541–1542.

Third, although *Alexander* did seemingly articulate a lower standard for similar misconduct, the particular standard articulated in that case was unimportant to the ultimate disposition of the case as the alleged misconduct by the comparator and the plaintiff was virtually identical. Specifically, in *Alexander*, after losing in a jury trial, the defendant complained on appeal that the trial court had not given an instruction requiring "same or nearly identical" conduct, but instead had allowed the jury to return a verdict for plaintiff if the jury found discrimination based on the employer's dissimilar treatment of similar employees. *Alexander*, 207 F.3d at 1333–1334. The panel rejected the defendant's contention, finding that the trial court's instruction was correct: "the phrase 'similarly situated' is the correct term of art in employment discrimination law." *Id.* at 1333. Yet a careful analysis of the facts before the panel suggests that the particular wording of the instruction was not

terribly critical as the conduct of the comparator and the plaintiff was largely identical.[9] Under all of these circumstances, this Court is unable to conclude that the *Alexander* panel intended such a broad change of the previously well-established standard in this circuit regarding the degree of similarity of misconduct necessary to establish a *prima facie* case of discriminatory discipline.

■ Applying this test of nearly identical conduct, this Court concludes that the plaintiff has not demonstrated that the alleged misconduct of her purported comparator, Melissa Allison,[10] was sufficiently similar to plaintiff's alleged misconduct to establish a *prima facie* case of discriminatory discipline. As set out in the facts above, defendant contends that plaintiff was fired for abandoning her shift without authorization on June 30, 1998. Plaintiff claims that she has presented evidence that Allison, a similarly situated white employee, also violated a similar work rule but was not fired until she had missed three consecutive days without authorization. The record reflects that Allison, a white OSA who worked with plaintiff under Wolfson's supervision, had three consecutive days of unexplained absences from work on June 11, 12, and 15, 1998 (June 12 was a Friday, and June 15 a Monday). The effective date of Allison's termination, as reflected on the termination form, was June 15, 1998, and Littlejohn signed the form on June 16, 1998.

First, in attempting to compare Allison's and plaintiff's discipline, the Court notes that the end result was the same for both employees: they were both terminated. Allison missed three contiguous days without calling in sick and, presumably on her return, was notified that she was fired. Plaintiff returned to work on the next day following her unapproved departure during the middle of a shift and was fired immediately upon her return. Thus, both plaintiff and Allison were fired. Nevertheless, plaintiff argues that because Allison would not have been fired had she just missed one day without calling in first to advise her superiors of her absence, Allison was treated differently from plaintiff. The question then becomes whether a failure to show up for work, without first obtaining approval, is the same as leaving one's job in the middle of a shift, without first notifying one's supervisor.

Defendant contends that, when comparing the misconduct of an employee who abruptly, and without notification, abandons her job in the middle of a shift with the misconduct of an employee who does not show up to work at all, defendant views the former misconduct as a much more serious threat to the orderly work of the plant than the latter. *See* Def.'s Statement of Material Facts ("SMF") at ¶ 79. Accordingly, defendant argues, an employee who so abandons her job is not similarly situated to an employee who fails to show up for work. As Littlejohn explains in his affidavit, a supervisor will be aware, at the

---

9. Plaintiff NeSmith, who was white, was reassigned pending an investigation into abuse of a prisoner in his control tower, even though two black officers who were more closely involved in the conduct that led to the abuse allegations were not reassigned pending investigation. *Alexander*, 207 F.3d at 1338–39. Likewise, plaintiff A.M. Alexander, who is also white, was suspended for allowing a subordinate to drive department cars home in violation of the sheriff's instructions, while a

similarly situated black officer who committed exactly the same conduct was not disciplined at all. *Id.* at 1336–37.

10. Plaintiff refers to this individual as Melissa Anderson, but the record reflects that her last name is actually "Allison." See Report and Recommendation at 16 n. 9; Def.'s Reply Brf., Ex. 4.

morning attendance meeting before the work day begins, that an employee has failed to show up and will be able to make adjustments in the work flow accordingly. Littlejohn Aff. at ¶ 4, Def.'s Reply Brf., Ex. 4. When an employee abruptly abandons work in the middle of a shift without notifying a supervisor, however, it could result in a work flow stoppage and backlog that could decrease productivity. *Id.* at ¶ 5. Indeed, defendant notes that it was plaintiff's job to pack products into boxes that were moving along a conveyor belt. *Supra* at 3. Because backups in plaintiff's area could create repercussions in other parts of the plant, Littlejohn required employees to notify their supervisors even if they were just going to the bathroom. Littlejohn Dep. at 42–43, 45. Thus, defendant contends that, as leaving a shift early without permission is a more serious infraction than not showing up at all, plaintiff was not similarly situated to Allison.

The Magistrate Judge concluded that plaintiff had demonstrated that Allison's alleged misconduct was similar enough to that of plaintiff to compel a conclusion that defendant had imposed dissimilar punishments for the same conduct. Because the two were treated differently and because Allison is white and plaintiff is black, the Magistrate Judge concluded that plaintiff had established a *prima facie* case of racial discrimination. Applying the strict test on this issue mandated by the Circuit, however, this Court is compelled to conclude that plaintiff has not shown the requisite degree of similarity. That is, while both acts represent similar types of deviations from the employer's expectations, the Court concludes that, given defendant's articulation of the different harms created by the different misconduct, plaintiff has not demonstrated that these two different acts are similar enough to establish a *prima facie* case of discriminatory discipline.

In reaching this conclusion, this Court is guided by the deliberative process utilized by the panel in *Bessemer.* Specifically, in that case, the plaintiff, who had reported to work late and inappropriately attired, was fired for insisting repeatedly that she be allowed to go home to lock up her house and for refusing to change into appropriate work attire after having been directed to do so by her supervisors. *Jones v. Bessemer Carraway Medical Ctr.,* 137 F.3d 1306, 1309–1310, *modified on other grounds,* 151 F.3d 1321 (11th Cir.1998). The plaintiff argued, however, that she had made out a *prima facie* case of disparate treatment because comparators of a different race than she had committed similar misconduct, but had not been discharged as a result. *Id.* at 1311–1312. In particular, these purported comparators had requested days off and, upon being denied leave, had taken these days off anyway. *Id.* at 1311. While the employer had treated this conduct by the comparators as attendance violations, for which termination was not mandated up to some unspecified point, it had not treated these acts as insubordination, for which termination was warranted. *Id.* The plaintiff's misconduct, on the other hand, had been construed as insubordination, for which she was fired. *Id.* at 1313 ("plaintiff's multiple instances of misconduct on the same day may simply have been 'the straw that broke the camel's back.' " (citation omitted)).

While the panel recognized some similarity between the conduct of the plaintiff and the comparators, it found that the misconduct was not similar enough to trigger an inference of disparate discipline for the same misconduct. It centered its analysis on a long-standing principle that an employer has the right to gauge the relative importance of different rules in the manner that the employer sees fit. Thus, the panel notes, "Title VII does not take

away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Id.* at 1311 (citing *Nix,* 738 F.2d at 1187). "Here, defendant was entitled to conclude that taking a day off after a request for the day off is denied is not insubordination [which would be a firable offense] under its rules, but instead, is an attendance violation [and not a firable offense]." *Id.* at 1312. "Nothing is wrong with this practice as long as the practice is followed in a nondiscriminatory manner (and no evidence shows discriminatory application—whites and blacks treated differently—of the practice)." *Id.*

In the instant action, defendant has presented evidence that it viewed an employee's walking off the job in mid-shift as a much more serious breach than simply not showing up for work at all, because the former has a much more disruptive effect on productivity than the latter. Thus, like the employer in *Bessemer,* defendant here articulated a distinction between the harm caused by a breach of two separate rules, which, on their face, initially appear similar. Following the reasoning of *Bessemer,* it is not for this Court to substitute its judgment for that of the employer by dictating to the latter that it must evaluate the significance of these two different breaches of conduct as the Court would have it do. Thus, while this Court might not have imposed as serious a sanction for the plaintiff's single breach, as did defendant, it is not up to this Court to act as a referee of the employer's determination as to the weight to give particular types of workplace misconduct. *See Abel v. Dubberly,* 210 F.3d 1334, 1339 n. 5 (11th Cir. 2000) ("Although termination may, to some, seem a draconian response given the level of the plaintiff's offense, the reasonableness of [the employer's] disciplinary policies are not a consideration.").

Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "Title VII addresses discrimination.... Title VII is not a shield against harsh treatment at the workplace." Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason ... does not have to be a reason that the judge or jurors would act on or approve."

*Nix v. WLCY Radio/Rahall Comm.,* 738 F.2d 1181, 1187 (11th Cir.1984) (citations omitted); *see also Abel,* 210 F.3d at 1339 n. 5.

Moreover, in the instant action, plaintiff has not presented any evidence that other black employees were treated differently from Allison, the purported comparator, when they did not show up for work on one occasion; conversely, plaintiff has not presented any evidence that any similarly situated white employee who left work in the middle of a shift without permission, as did plaintiff, was not fired as a result. If plaintiff had presented such evidence, then she might have been able to establish the existence of a relevant comparator sufficient to meet her burden of establishing a *prima facie* case of discriminatory discipline. Because the Court concludes that Allison's conduct was not "nearly identical" to that of plaintiff, however, it must conclude that plaintiff has failed to present evidence that a similarly situated person outside her protected class was subjected

to more favorable treatment and hence plaintiff has failed to make out a *prima facie* case.

### 2. Plaintiff's violation or non-violation of work rule

█ Before finally concluding that plaintiff has not established a *prima facie* case of discriminatory discipline, however, the Court must also address plaintiff's argument that she did not actually violate the work rule that she was accused of violating. Specifically, plaintiff alleges that on her way out of the building, after being unable to find her supervisor, Gayle Wolfson, she saw Tracee Hines, another supervisor, and told Hines that she was leaving. Hence, by so informing Hines, plaintiff contends that she gave appropriate notification to her employer that she was leaving.

The evidence of this alleged encounter with Hines is highly confusing. Hines, who could have shed some light at least on her own version of the facts, was not deposed by plaintiff, although defendant did provide a brief affidavit from Hines. Viewing the facts in the light most favorable to plaintiff, the evidence reflects that, on the morning of June 30, 1998, plaintiff left a note for Wolfson stating that she was "hot" and had to leave work early, then told Hines, a black supervisor, that she had to leave work early because of a medical problem. Hines indicated that it was all right for plaintiff to leave and that she would inform Wolfson that plaintiff had left early. *See* Holston Dep. at 120. Al-

though Hines denies ever giving permission to plaintiff to leave early,[11] and the evidence is thus in conflict on this issue, because the facts must be viewed in the light most favorable to plaintiff, the Court must assume for the purpose of this analysis that plaintiff did in fact obtain permission from Hines to leave early that day.

After Wolfson gave plaintiff's note to Littlejohn, the undisputed evidence indicates that Littlejohn conducted interviews of the supervisors and lead persons to determine whether plaintiff had informed anyone that she was leaving early. It is undisputed that he was informed by everyone he interviewed, including Hines, that plaintiff had not obtained permission to leave early, nor had she even notified anyone that she was leaving early. When plaintiff arrived at work on July 1, 1998, she was escorted by Wolfson into Littlejohn's office, where Littlejohn notified plaintiff that her employment was being terminated because of her abandonment of her job the previous day. According to plaintiff, she told Littlejohn that Hines had given her permission to leave early, but Littlejohn did not accept her explanation.[12] *See* Holston Dep. at 135–136.

Notwithstanding the inconsistencies in the testimonies of the various witnesses, the Court must assume that plaintiff's version is true: that is, that she informed Hines that she was leaving and that Hines indicated that she would tell Wolfson. Moreover, the Court will assume that Hines was not forthcoming in her discus-

---

11. Hines's affidavit is virtually silent as to the details of the conversation between her and plaintiff on the morning of June 30, 1998, and in fact, is silent as to whether the conversation even took place. Hines did state in her affidavit, however, that Holston never asked her for permission to leave early that day, and Hines never gave Holston permission to do so. Hines Aff. at ¶¶ 5–6; *see* note 2, *supra.*

12. Littlejohn, however, disputes this and states that plaintiff never informed him that Hines had given her permission to leave. Littlejohn Dep. at 62. In fact, he stated that if plaintiff had so informed him, he would not have terminated her at that point, but instead would have investigated the matter further. *Id.*

sion with Littlejohn and did not indicate that she had given plaintiff permission to leave early. Even with these assumptions, however, the undisputed evidence is that the decision maker, Littlejohn, conducted a thorough investigation, questioned everyone involved, and, on the basis of what he was told during that investigation, determined that plaintiff had not gained any supervisor's permission to leave.[13] Thus, the undisputed evidence is that Hines never told Littlejohn that she had given plaintiff permission to leave or that she had told plaintiff she would inform her supervisor of her departure.[14] Accordingly, even assuming that plaintiff mentioned the alleged conversation with Hines to Littlejohn, the latter clearly credited the account of his supervisor over that of plaintiff. Indeed, plaintiff offers no *evidence* to suggest that Littlejohn acted out of anything but a good-faith belief that she had abruptly left her station, without communicating that departure in a manner that would allow her supervisor to make prompt arrangements to staff her place on the assembly line.

The question for this Court is what significance to give to plaintiff's alleged effort to inform her supervisor, because if plaintiff did make reasonable efforts to inform her supervisor promptly of her departure, she arguably did not violate any work rule. The Eleventh Circuit has held, however, that as long as the defendant held a good-faith belief that the plaintiff had, in fact, breached the work rule, a plaintiff cannot prevail, even if she did not actually violate this rule. *See Jones v. Bessemer Carraway Medical Ctr.,* 137 F.3d 1306, 1309–1310, *modified on other grounds,* 151 F.3d 1321 (11th Cir.1998); *Smith v. Papp Clinic,* 808 F.2d 1449, 1452–53 (11th Cir.1987) (upholding jury instruction that if employer fired an employee because it honestly believed that employee had violated company policy, the discharge is not because of race, even if the employer turned out to be mistaken in its belief).

In *Bessemer,* the Eleventh Circuit addressed this issue straight on, and held that a plaintiff cannot make out a prima facie case merely by showing that she did not violate the work rule in question. Instead, she must show that a similarly situated employee outside the protected group who disputed a violation of a rule was treated better. *Bessemer,* 137 F.3d at 1311 n. 6. In *Bessemer II,*[15] the panel reiterated this conclusion:

plaintiff cannot avoid this result simply by disputing whether Smith or Carlin actually instructed her to change into scrubs. There may have been a misunderstanding. *Smith may have been mistaken or lied. Carlin may have been mistaken or lied.* But federal

---

13. Although it is undisputed that all supervisors told Littlejohn on June 30 that they had not given plaintiff permission to leave early that day, plaintiff does aver that, when Littlejohn informed her on July 1 that she was being fired for leaving early the day before, she responded that she had received permission from Hines to leave early. Although Littlejohn testified that plaintiff never mentioned her conversation with Hines, *see* note 12, *supra,* the Court must assume that she did in fact inform Littlejohn that she had received permission from Hines to leave early, as the Court must construe the facts in the light most favorable to plaintiff.

14. Again, as plaintiff never deposed Hines, and thus never asked Hines what she told Littlejohn, the undisputed evidence is necessarily as described.

15. In *Bessemer II,* the panel denied the motion for rehearing, but modified that portion of the opinion issued in *Bessemer* that discussed direct versus circumstantial evidence. *Bessemer II,* 151 F.3d 1321, *modifying* 137 F.3d 1306.

courts do not sit to review the accuracy of the employer's fact findings or of the employer's decision to terminate a plaintiff's employment.

*Bessemer II,* 151 F.3d 1321, 1324 n. 16 (emphasis added);[16] *see also Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (fact that complaining employees may have been "lying through their teeth" is irrelevant; question is whether supervisors who terminated plaintiff believed him to be guilty of misconduct); *Nix v. WLCY Radio/Rahall Comm.,* 738 F.2d 1181, 1187 (11th Cir.1984) ("Title VII is not a shield against harsh treatment in the workplace").

In addition, the *Bessemer* panel addressed the arguably inconsistent language in *Jones v. Gerwens*[17] to the effect that a plaintiff might be able to make out a *prima facie* case if she could produce evidence that she did not actually violate the work rule in question. The *Bessemer* panel concluded that this language from *Jones* was only dictum and interpreted this language to require only that a plaintiff show that she was accused of workplace misconduct, whether admitted or denied. *Bessemer,* 137 F.3d at 1311 n. 6. The panel's conclusion that the *Jones* language is dictum is supported by a reading of the *Jones* opinion. First, the determining fact for the *Jones* panel in its ruling for the employer was not whether or not the plaintiff had actually violated the rule, but was the fact that the plaintiff's purported comparators had been supervised by different supervisors than was plaintiff. *Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989). Moreover, the plaintiff's denial of violating some of the work rules was to little effect, as these denials had arisen only after commencing litigation; the plaintiff had earlier admitted during a disciplinary hearing that he had committed all the rule violations with which he had been charged. *Id.* at 1537.

Finally, any suggestion that a plaintiff's assertion that she did not violate the work rule in question yields a different result depending on whether one applies *Jones* or *Bessemer* is belied by a thorough reading of *Jones.* Specifically, *Jones* states that an employer may rebut an employee's *prima facie* case by showing that it honestly believed that the employee committed the violation in question. *Bessemer* holds simply that a good-faith belief by the employer negates a *prima facie* case. Thus, notwithstanding its seemingly inconsistent language, the analytic framework used in *Jones* will yield the same result as that in *Bessemer:* in cases in which a plaintiff establishes a *prima facie* case of discrimination by presenting evidence that she did not actually violate the rule she was accused of violating, the employer will still prevail if it can establish that, at the time it fired the plaintiff, it had a good-faith belief that she did violate the rule. Accordingly, the employer will win for the same reason under either analysis: its good-faith belief that the employee violated the rule. Thus, even if not dictum,

---

**16.** The *Bessemer II* panel went on to note that the true reasons for the plaintiff's termination would be important only if they demonstrated that the employer's proffered reasons were pretextual; that is, a lie or a phony reason. "But, because we conclude that plaintiff 'failed to present a prima facie case of discrimination, we need not examine defendant's articulated reasons for discharging her, nor determine whether those reasons were merely a pretext for discrimination.'" *Bessemer II,*

151 F.3d at 1324 n. 16 (citations omitted). Similarly, in the present case, as this Court has concluded that plaintiff has not made out a *prima facie* case, the Court does not proceed to the pretext part of the analysis. Moreover, there is no evidence that Littlejohn or Hines, both of whom, like plaintiff, were black, had any racially discriminatory animus against plaintiff. *See* discussion *infra.*

**17.** 874 F.2d 1534 (11th Cir.1989).

*Jones* does not really allow a plaintiff's protestation of a rule violation to act as a bar to summary judgment for the employer if the latter had a good-faith basis for believing that the violation had occurred.[18]

 In summary, plaintiff's contention that she did not violate the rule is of no analytic effect. She has failed to make out a *prima facie* case as there is no evidence that Littlejohn lacked a good-faith basis for believing that plaintiff had left work early without permission from her supervisor, in violation of a workplace policy.

### 3. Alleged discriminatory animus by Wolfson

Plaintiff has also argued that her immediate supervisor, Gayle Wolfson, harbored some discriminatory animus toward black employees as plaintiff perceived that Wolfson, as a general matter, treated white employees better than black employees. *See* Holston Dep. at 79–81. Any racial bias by Wolfson is beside the point in this case, however. She simply reported what she, in undisputed good faith, believed to be plaintiff's abrupt departure from her duty station to Littlejohn, who was the shipping manager of the Regional Distribution Center, and showed him the note that plaintiff had left on her desk.[19] Thereafter, Littlejohn conducted the investigation and made the decision to report plaintiff's violation to the Human Resources Department, after which both Littlejohn and a representative of Human Resources made the decision to discharge plaintiff. It is undisputed that other than informing Littlejohn of plaintiff's unannounced departure, Wolfson played no role

in the events that ultimately led to plaintiff's termination. To criticize Wolfson's reporting of plaintiff's departure to Littlejohn—and suggest that Wolfson's communication connoted some discriminatory animus—prompts the question as to what other action Wolfson was supposed to take. Had Wolfson not reported plaintiff's absence, she arguably would have been in dereliction of her own supervisory duties. Moreover, plaintiff has offered no evidence that Wolfson had failed to report similar conduct by white employees.

Indeed, the *Bessemer II* panel addressed a similar contention. In that case, the plaintiff contended that her immediate supervisor, Smith, who reported the plaintiff's misconduct to a higher supervisor, Carlin, harbored a discriminatory animus toward the plaintiff. Substituting Wolfson for Smith and Littlejohn for Carlin, the panel's discussion makes clear that the immediate supervisor's underlying biases, if any, did not give rise to a *prima facie* case by the plaintiff in that case or in the instant action. Thus, the panel stated that:

> [N]othing in the record shows Smith [Wolfson], on the pertinent day, did more than orally report an incident to Carlin [Littlejohn]. No evidence shows that Smith had failed, in the past, to report to Carlin [Littlejohn] (or to another supervisor) employee misconduct that was similar to plaintiff's conduct. Nothing shows that Smith [Wolfson] coaxed Carlin [Littlejohn] to take any disciplinary action of any kind, much less recommended that Carlin [Littlejohn] refer plaintiff to the personnel

---

18. *See Abel v. Dubberly,* 210 F.3d 1334, 1339 (11th Cir.2000) (although plaintiff who was fired for admittedly taking money out of the cash drawer argued that another employee potentially guilty of same offense was not fired, different result is justified by the fact that plaintiff admitted to taking the money,

whereas comparator had denied doing so and there was no evidence that the employer had sufficient proof that comparator had done so).

19. As indicated, plaintiff had left a note on Wolfson's desk that stated: "Gayle, I'm too hot! Had to leave. Schawanda."

committee to be discharged. No evidence suggests that Carlin [Littlejohn] had reason to believe that Smith [Wolfson or Hines] was an unreliable reporter.... Nothing in the record shows that Carlin's [Littlejohn's] decision to refer plaintiff's case to the personnel committee was anything but Carlin's [Littlejohn's] independent decision following Carlin's [Littlejohn's] own meeting with plaintiff.... Nor is there evidence that Carlin [Littlejohn] had a history of racial statements or of racial discrimination in her [his] decisions.

*Bessemer II,* 151 F.3d at 1323. Thus, like the plaintiff in *Bessemer,* plaintiff in the instant action has not demonstrated that any alleged discriminatory animus harbored by Wolfson had any impact on the employment decision in her case.[20]

■ Finally, the Court must point out that the both the decision maker, Rodney Littlejohn, and the supervisor who failed to confirm plaintiff's version of the events that transpired on the day she left work early, Tracee Hines, are black, just as is plaintiff. While that fact is not necessarily dispositive,[21] it further bolsters the Court's conclusion that plaintiff has failed to present sufficient evidence that the real reason she was fired is because she is black. As the Eleventh Circuit has noted, when the decision makers are in the same protected class as the employee complaining about an adverse employment decision, the employee faces a more difficult burden in establishing that a discriminatory animus played a role in the decision complained about. *Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1471 (11th Cir.1991); *see also Welch v. Delta Air Lines, Inc.,* 978 F.Supp. 1133, 1153 (N.D.Ga.1997) (Hull, J.). Although one can conceive of circumstances in which the fact that the firing supervisor's membership in the same racial group as the plaintiff does not negate an inference of racial discrimination, this case contains none of those circumstances.

In summary, plaintiff has not presented sufficient evidence to establish a *prima facie* case of racial discrimination in defendant's decision to discharge her for what defendant believed to her violation of workplace rules. Although plaintiff may feel that she was treated unfairly, and reasonable people may consider her employer's decision to fire her an extreme reaction and perhaps disproportionately severe, federal courts are not empowered to remedy the wrong she perceives, unless she is able to show that her treatment was based on her race and no other reason.

Federal courts must correct injustices resulting from violations of federal law. The temptation to decide, in other cases, who is "right", the boss or the employee, should be resisted. This is so, I submit, even where the employee who is unfairly treated is a member of a protected group. If the "raw deal" was not related to (in this case) race, federal law and federal courts are not implicated. Mem-

20. Furthermore, in *Bessemer,* the plaintiff had presented evidence that Smith had made overtly discriminatory remarks, such as "You black girls make me sick, sometimes I feel like just hitting you in the head," and "You black girls get away with everything." *Bessemer II,* 151 F.3d at 1322 n. 10. In the instant action, plaintiff has not produced any evidence of overtly discriminatory remarks by Wolfson, but has alleged only that she treated white employees more favorably on occasion.

21. *United States v. Crosby,* 59 F.3d 1133, 1135 n. 4 (11th Cir.1995) (although a Title VII violation may occur even where a supervisor or decision-maker is of the same race as the alleged victim...there was no evidence that black supervisor held members of his own race to a higher standard of conduct than members of another race) (citing *Billingsley v. Jefferson County,* 953 F.2d 1351, 1353 (11th Cir.1992) (Title VII provides cause of action even where decision-maker and employee are members of the same race)).

bers of protected groups are not "wards of the court"; federal judges are not guardians to correct injustices wherever they involve minority races, the elderly, or those of a mistreated sex.

*Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 802 (11th Cir.1988) (J. Hill, concurring). The undisputed evidence reflects that Littlejohn had a good-faith belief that plaintiff had abandoned her job without permission. Moreover, as plaintiff has not made out a *prima facie* case of racial discrimination, because she has not shown the commission of nearly identical conduct by a comparator, defendant is entitled to summary judgment on plaintiff's claim of race discrimination.

### III. *Plaintiff's Retaliation Claim*

In addition to protecting employees from discrimination based on race or sex, Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment because he has opposed any practice made an unlawful practice by this subchapter.

42 U.S.C. § 2000e–3(a). Plaintiff has alleged that she made an internal complaint of race discrimination against Wolfson, her supervisor, and that defendant unlawfully retaliated against her for filing that complaint when it fired her.

Proof of retaliation is governed by the same framework of shifting evidentiary burdens established in *McDonnell Douglas* and *Burdine*. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir.1986) (footnote omitted); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir.1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991) (footnote omitted); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985). Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601; *see also Weaver*, 922 F.2d at 1525–1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601.

#### A. *Prima Facie* Case

To make out a *prima facie* case of retaliation under Title VII, plaintiff must show that she "(1) engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation; and (3) that there is a causal connection between the protected activity and the adverse employment action." *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir.1992) (quoting *Whatley v. M.A.R.T.A.*, 632 F.2d 1325, 1328 (5th Cir.1980)); *see also Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir.1998); *Coutu v. Martin County Bd. of Comm'rs*, 47 F.3d 1068, 1074 (11th Cir.1995); *Weaver*, 922 F.2d at 1524; *Simmons*, 757 F.2d at 1189. It is irrelevant to the retaliation claim whether the plaintiff can prove an underlying claim of discrimination. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994).

Defendant does not dispute that plaintiff engaged in statutorily protected expres-

sion when she allegedly complained about race discrimination by Wolfson, nor does it dispute that firing plaintiff was an adverse employment action. Defendant argues, however, that she has failed to establish a causal connection between her internal complaint and her discharge.

■ In order to establish the third element of her *prima facie* case of retaliation, plaintiff must produce evidence that would allow a reasonable jury to infer that there was a causal link between her protected activity and the adverse employment action. Plaintiff is not required to establish "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985); *see also Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir.1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir.1991). Rather, plaintiff can satisfy the third element merely by presenting evidence that her protected activities and the subsequent adverse employment actions are not totally unrelated. *Simmons*, 757 F.2d at 1189; *see also Hairston*, 9 F.3d at 920; *Weaver*, 922 F.2d at 1525.

■ In the instant action, plaintiff has presented evidence that she made a written complaint about alleged racial discrimination by Wolfson in mid-May, 1998, and, although she had a consistently good work record up until that time, was fired just over one month later on July 1, 1998. She has also presented evidence that, soon after she submitted her written complaint, she discussed her complaint with Littlejohn, and that it was Littlejohn who later made the decision to fire her. Thus, plaintiff has shown at a minimum that Littlejohn was aware of her complaint, and that

he took the adverse employment action against her shortly thereafter.

Defendant argues, however, that temporal proximity alone does not provide a causal connection, citing *Lockaby v. United Testing Group, Inc.*, 986 F.Supp. 1400, 1404 (N.D.Ga.1997) (Carnes, J.). The undersigned did state in *Lockaby* that "the mere fact that an employee's protected speech preceded an adverse employment decision does not establish causation so as to render an employer liable for discrimination." *Id.* Nevertheless, in that case, the plaintiff had not presented any evidence that the decisionmakers had any knowledge of the alleged protected activity, and that lack of evidence was critical to the holding in that case that "'suspicious' timing cannot logically lead to an inference of discrimination where it is undisputed that the decision makers had no knowledge of plaintiff's protected activity, and so could not possibly have been motivated by the protected activity in terminating plaintiff's employment." *Id.*

In the instant action, however, it is undisputed that Littlejohn was aware of plaintiff's complaint, and that it was Littlejohn who made the decision to fire plaintiff approximately six weeks later. Under those circumstances, and because of the fact that plaintiff was fired without any prior warnings or other intermediate disciplinary measures, the Court finds that plaintiff has presented a *prima facie* case of retaliation.

**B. Defendant's Legitimate Reason**

■ Although the Court has concluded that plaintiff has presented sufficient evidence to establish a *prima facie* case of retaliation under Title VII, the analysis does not end there. As noted *supra*, once a plaintiff presents evidence sufficient to permit an inference of discrimination, and thus establishes a *prima facie* case, the

defendant must then articulate some legitimate, nondiscriminatory reason for the adverse employment action, and produce some evidence in support of that reason. *See* discussion *supra* at 1325.

In this case, defendant has presented ample evidence of a legitimate non-retaliatory reason for its decision to terminate plaintiff's employment and for its differential treatment of plaintiff and Allison. Defendant has produced evidence that plaintiff left her job manning a conveyor belt in the middle of her shift on June 30, 1998 and that the primary decision maker with regard to the termination decision, Rodney Littlejohn, had reason to believe that plaintiff had not first notified or obtained permission from a supervisor. Defendant has further presented evidence that it considered leaving a shift early without permission from a supervisor to be a very serious infraction, and more serious an infraction than not showing up for work at all.

Because defendant has produced evidence of an intervening reason for its decision to fire plaintiff that was wholly unrelated to her alleged protected activity, plaintiff must produce sufficient evidence that defendant's proffered reason is merely a pretext for unlawful retaliation in order to defeat defendant's Motion for Summary Judgment.

C. Pretext

In order to defeat defendant's motion with respect to her claim of retaliation, plaintiff must produce evidence suggesting that defendant's proffered reasons for its decision to fire her are merely a pretext for unlawful retaliation. Plaintiff may carry her burden by showing that these reasons had no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. The Court concludes that plaintiff has failed to present evidence that defendant's proffered reasons for its decision to fire her are unworthy of belief or that it was actually motivated by unlawful motives.

As discussed at length *supra*, the undisputed evidence reflects that Littlejohn was informed by Wolfson that plaintiff had left her job early on June 30, 1998, without permission, and that, as a result of his investigation, he concluded that plaintiff had not obtained permission from any other supervisor or lead person, nor had she even notified anyone that she was leaving. Although plaintiff contends that she did get permission from another supervisor, the undisputed evidence indicates that Littlejohn believed that no supervisor had given plaintiff permission to leave early.

Plaintiff has produced no evidence that Littlejohn's reasons for terminating her had no basis in fact. She did leave, abruptly, in mid-shift and, while Hines may or may not have given plaintiff permission to leave, the evidence is undisputed that Littlejohn had a good-faith belief that plaintiff had not obtained permission from any supervisor. She has likewise produced no evidence that these stated reasons were insufficient to motivate the decision. Littlejohn has testified that it was extremely important that an employee in plaintiff's unit notify a supervisor if the employee were going to be away from her station for even a short period of time. Moreover, plaintiff has produced no evidence that Littlejohn or defendant, generally, had ever failed to fire an employee who had not filed a discrimination complaint, but who was suspected of this same misconduct. Indeed, plaintiff has produced no evidence that Littlejohn had ever failed to fire any employee who he believed to have engaged in such conduct.

Finally, as to whether Littlejohn's stated reasons were the true factors motivating the decision, plaintiff has produced no evi-

dence that they were not. Moreover, from the particular circumstances of this case, the Court can discern no reason why Littlejohn's stated basis for termination would not have been the true basis. Specifically, plaintiff had complained to Littlejohn that Gayle Wolfson, her white supervisor, had shown favoritism to white employees in making assignments to the "lead" position on the line. Wolfson was Littlejohn's subordinate. Plaintiff has not produced any evidence that would suggest that this complaint to Littlejohn, whose job it was to receive complaints about his line supervisors,[22] would prompt Littlejohn to trump up reasons to fire plaintiff. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 745 (11th Cir.1996) (panel expressed scepticism that decisionmaker fired plaintiff out of retaliatory motive to avenge another official against whom plaintiff had complained). Moreover, this situation is not one in which the decision maker took the lead in ferreting out or identifying misconduct or bad performance, such as a supervisor who begins giving bad performance reviews, after a complaint, to an employee who had previously received good evaluations. *See Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 921 (11th Cir. 1993). Here, Littlejohn merely reacted to events that plaintiff, herself, had set into motion. In short, plaintiff has not introduced any evidence to show that Littlejohn's reasons for terminating plaintiff were a pretext for his desire to retaliate against plaintiff because of her earlier complaint against Wolfson. Therefore, defendant's Motion for Summary Judgment on the retaliation claim should likewise be GRANTED.

**22.** Plaintiff, and apparently other employees, had previously complained to Littlejohn about Wolfson's bad breath, with no adverse action resulting. Holston Dep. at 111. If the first complaint did not unduly bother Littlejohn, there appears to be no reason why Littlejohn,

### IV. *Plaintiff's State Law Claims*

In addition to her claims under federal law, plaintiff has also asserted claims under Georgia law for intentional infliction of emotional distress and negligent retention. The Magistrate Judge recommended that defendant's motion for Summary Judgment be granted as to those claims, and neither party has objected to that recommendation. Accordingly, the Magistrate Judge's recommendation as to those claims is adopted, and defendant's Motion for Summary Judgment [12] is **GRANTED** as to plaintiff's state law claims.

### CONCLUSION

The Magistrate Judge's Report and Recommendation [21] is **ADOPTED IN PART and REJECTED IN PART**. The Court **ADOPTS** the Magistrate Judge's recommendation as to plaintiff's state law claims of intentional infliction of emotional distress and negligent retention. The Court **REJECTS** the Magistrate Judge's recommendation, however, as to plaintiff's claims of race discrimination under Section 1981 and Title VII and retaliation under Title VII. Defendant's Motion For Summary Judgment [12] is therefore **GRANTED** in its entirety.

who himself was black, would feel vengeful toward plaintiff about her second complaint alleging that Wolfson had favored some white employees over her in regard to the selection of the "lead" employee.